McCAHILL v COMMERCIAL UNION INSURANCE COMPANY

Docket No. 99183. Submitted December 12, 1988, at Lansing. Decided
    September 5, 1989.

Fire extensively damaged a home owned by plaintiff, Carl A.
    McCahill. Plaintiff had an insurance policy issued by defendant,
    Commercial Union Insurance Company, which insured the
    house for $64,000 and its contents for $32,000. Defendant
    denied plaintiff's claim citing arson, fraud and false swearing
    by plaintiff as its reasons for denying the claim. Plaintiff
    brought an action against defendant in the Washtenaw Circuit
    Court alleging breach of contract and intentional infliction of
    emotional distress. The trial court, Henry T. Conlin, J., denied
    defendant's motion for a directed verdict on the emotional
    distress claim. The jury determined that plaintiff did not set or
    procure the setting of the fire, that plaintiff did not wilfully
    conceal or misrepresent any material fact or circumstance
    concerning the insurance, and that he did not engage in any
    false swearing. The jury determined that the replacement cost
    of the building was $80,000 and the replacement cost of the
    contents was $27,968. The jury also determined that plaintiff
    was entitled to $100,000 for the intentional infliction of emo-
    tional distress. The trial court entered a judgment for plaintiff
    in the amount of the jury's verdict plus judgment interest,
    costs, penalty interest and attorney fees. Defendant appealed
    from that judgment and the denial of its motions for judgment
    notwithstanding the verdict, a new trial or remittitur.

    The Court of Appeals *held:*

    1. The trial court did not err in denying defendant's motion
    for a directed verdict on plaintiff's intentional infliction of
    emotional distress claim. Plaintiff made out a prima facie case
    relative to the element of extreme and outrageous conduct. The
    evidence established that defendant, if not intentionally, reck-
    lessly caused plaintiff to suffer extreme emotional distress.

    2. Plaintiff established that he was entitled to recovery for

REFERENCES

Am Jur 2d, Damages §§ 648 *et seq.*; Fright, Shock, and Mental
    Disturbance §§ 1 *et seq.*; Insurance §§ 727, 1032.
See the Index to Annotations under Emotional Injury; Insurance
    and Insurance Companies; Interest on Money.

replacement costs without actually replacing his property. Under the facts of this case, plaintiff was excused from performing the condition precedent of replacing his property due to the defendant's hinderance of plaintiff's performance of the condition precedent.

3. The trial court erred in permitting plaintiff to recover an award in excess of the policy limits in his insurance contract. The portion of the lower court's judgment awarding plaintiff $80,000 for the replacement costs of the dwelling is reversed and the matter remanded to the trial court for entry of an amended judgment of $64,000 for the replacement costs of the dwelling.

4. The trial court erred in ordering that plaintiff was to recover both statutory interest and penalty interest. An award of penalty interest pursuant to the Uniform Trade Practices Act, such as in this case, must be offset by any award of interest that is payable by the insurer pursuant to the award. Plaintiff's award of penalty interest should stand, however, that award should be offset by the statutory interest award.

Affirmed in part, reversed in part and remanded.

1. TORTS — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

The elements of a prima facie case of intentional infliction of emotional distress are: (1) extreme or outrageous conduct, (2) which intentionally or recklessly, (3) causes, (4) extreme emotional distress; such conduct must be more than a mere bad-faith breach of an insurance contract, and more than mere threats, insults or indignities; the extreme and outrageous character of the challenged conduct may arise from the abuse of a relationship which puts the defendant in a position of actual or apparent authority over the plaintiff or gives the defendant power to affect the plaintiff's interests.

2. TORTS — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS — MEDICAL TREATMENT.

The seeking and receiving of medical treatment is not a condition precedent to satisfying the element of extreme emotional distress in an action for intentional infliction of emotional distress.

3. INSURANCE — CONDITIONS PRECEDENT — EQUITY.

An insured's performance of a condition precedent for recovery under an insurance policy is excused on equitable grounds where the insurer hinders the insured's performance of the condition precedent.

4. Judgments — Penalty Interest — Statutory Interest — Uniform Trade Practices Act.

An award of penalty interest to an insured pursuant to the Uniform Trade Practices Act must be offset by any award of statutory interest that is payable by the insurer pursuant to the award (MCL 500.2006[1] and [4], 600.6013; MSA 24.12006[1] and [4], 27A.6013).

*Domol & Domol, P.C.* (by *Robert C. Domol* and *Anthony S. Domol*), for plaintiff.

*Denenberg, Tuffley, Bocan, Jamieson, Black, Hopkins & Ewald, P.C.* (by *David R. Tuffley, Dana L. Ramsay,* and *John A. Lawson*), for defendant.

Before: Shepherd, P.J., and Murphy and T. Gillespie,* JJ.

Murphy, J. Following a thirteen-day jury trial on plaintiff's breach of contract and intentional infliction of emotional distress claims against defendant, a judgment of approximately $208,000 was entered in plaintiff's favor. The trial court denied defendant's motions for judgment notwithstanding the verdict, new trial or remittitur. Defendant now appeals as of right.

On July 21, 1983, fire extensively damaged a farmhouse owned by plaintiff which is located in Manchester, Michigan. James Kensler, who had been a Manchester fireman since 1949 and fire chief from 1963 until 1984, testified that since 1949 he had fought and investigated about fifteen hundred fires. He explained that on the day of the fire there was severe weather. There had been a tornado watch which was elevated to a tornado warning. He dispatched several fire trucks to watch for tornados. Apparently, a tornado was

---

* Former circuit judge, sitting on the Court of Appeals by assignment.

sighted and there had been a severe electrical storm. He described the weather as follows:

> Well, it went from a tornado watch to a tornado warning and involving this storm, we had very heavy lightning and rain and wind and I mean heavy lightning. And it was a severe storm.

He received a call that there was a house fire on Wolfe Road. Approximately thirty firemen responded, sixteen from Manchester, twelve from Sand Lake, and the Clinton Fire Department responded with tanker trucks. When he arrived at the scene, the building was burning "furiously" in the center of the house. The fire was "knocked down" fairly quickly and it started again. The fire was then extinguished.

He explained that the fire seemed to burn right through the middle of the house. He elaborated:

> It was a strange type of a fire because when fires smolder, you can smell them and you'll see where the smoke will cook out of the eaves and this house didn't have this.
>
> It's the type of fire that was almost instant. I mean, it was a hot—so the first thing that comes to our mind is lightning. This house had lightning rods on it and at the time I shook my head. I found part of the center lightning rod on the house.
>
> * * *
>
> And as the men were continuing their investigation, I didn't say a word because these are the men that are trained to—and I walked around to the back of the house to find out why—when lightning rods are on a house, this house is supposed to be grounded.
>
> Well, the cable that grounds the house was all rotted away on the back of the house. There was a foot or two missing out of it. It was just rusted away.

He concluded that plaintiff's home was struck by a bolt of lightning which immediately started the fire.

Plaintiff had an insurance policy issued by defendant which insured the house for $64,000 and its contents for $32,000. At the time of the fire, plaintiff, who is a dentist with a practice in Adrian, was residing in a home located in Adrian.

Thomas Glow, a general adjustor for defendant, inspected the damaged property four days after the fire. He testified that plaintiff agreed to meet him at the property. However, plaintiff testified that he had not been informed that the inspection was to take place on that date and that it took place without his permission. Glow's inspection raised doubts about the origin of the fire. He hired Wilbur Massey, an investigator from INS Investigations, to inspect the site. Massey investigated the site on July 27, 1983, and concluded that the fire had been set deliberately.

Initially, defendant sent proof of loss statements to plaintiff's farmhouse address. On September 6, 1983, plaintiff received a proof of loss form at his Adrian address. On or about September 16, 1983, Glow telephoned plaintiff and requested that he make a proof of loss statement over the telephone. Plaintiff refused to do so. Plaintiff testified that Glow telephoned between midnight and 2:00 A.M. and spoke to him in an arrogant manner. Glow testified that he telephoned plaintiff during business hours and denied that he spoke in an arrogant manner. Glow also denied that defendant sent the proof of loss forms to the wrong address intentionally.

On December 12, 1983, some six months after the fire, plaintiff received a letter from defendant informing him that his claim had been denied. Defendant cited arson, fraud and false swearing by

the policyholder as its reasons for denying the claim. Glow testified that he made the decision, which was approved by his supervisors, to deny the claim. Plaintiff testified that he was shocked when he received the letter, that the situation caused him embarrassment, and that he thought he was the subject of a rumor concerning the origin of the fire.

In April, 1984, plaintiff filed suit alleging that defendant had maliciously, fraudulently and surreptitiously breached its contract by refusing to pay his claim. Plaintiff also alleged that defendant, through its agents, intentionally, deliberately and maliciously entered upon his property without his prior knowledge and consent and changed the physical characteristics of the realty. Moreover, plaintiff alleged that defendant's agents entered onto the property with the intention and purpose of defeating plaintiff's loss claim. Plaintiff also alleged that defendant's acts constituted malicious and outrageous conduct which led him to suffer injury to his personal and business reputation and to suffer mental anguish and severe emotional distress.

The matter proceeded to a jury trial and, at the conclusion of plaintiff's proofs, defendant moved for a directed verdict on plaintiff's emotional distress claim. The court denied the motion.

After all of the testimony was completed, the jury answered a series of special questions and found for plaintiff. Specifically, the jury determined that: (1) plaintiff did not set or procure the setting of the fire; (2) plaintiff did not wilfully conceal or misrepresent any material fact or circumstance concerning the insurance, and that he did not engage in any false swearing; (3) the replacement cost of the building was $80,000 and $27,968 for the replacement cost of the contents;

and, finally, (4) plaintiff was entitled to $100,000 for the intentional infliction of emotional distress. Defendant now appeals as of right.

Defendant first contends that the trial court erred in denying its motion for a directed verdict on plaintiff's intentional infliction of emotional distress claim.

In *Caldwell v Fox,* 394 Mich 401, 407; 231 NW2d 46 (1975), our Supreme Court addressed the standard to be used in making the determination whether a motion for a directed verdict should be granted:

> At the outset we reiterate a well-established principle of law: The jury, not the trial judge, is the trier of fact. Whenever a fact question exists, upon which reasonable persons may differ, the trial judge may not direct a verdict. Conversely, when no fact question exists, the trial judge is justified in directing a verdict. In deciding whether or not to grant a motion for a directed verdict, the trial judge must accord to the non-moving party the benefit of viewing the testimony and all legitimate inferences that may be drawn therefrom in a light most favorable to the non-moving party. If the evidence, when viewed in this manner, establishes a prima facie case, the motion for a directed verdict must be denied. In *Detroit & Milwaukee R Co v Van Steinburg,* 17 Mich 99, 117 (1868), Chief Justice Thomas M. Cooley said:
>
> "In determining this question, we must look at the case as it appears from the plaintiff's own testimony, unqualified by any which was offered on the part of the defendants, and must concede to him any thing which he could fairly claim upon that evidence. *He had a right to ask the jury to believe the case as he presented it; and, however improbable some portions of his testimony may appear to us, we can not say that the jury might not have given it full credence. It is for them, and not for the court to compare and weigh the evidence.*"

This standard was most recently reaffirmed in *Dodd v Secretary of State,* 390 Mich 606, 612; 213 NW2d 109 (1973), where it was said that the court must "view the testimony in the light most favorable to the plaintiff and draw the reasonable inferences therefrom which are in his favor." [Emphasis added.]

This Court has also recently stated that if the evidence, viewed in a light most favorable to plaintiff, establishes a prima facie case, a defense motion for a directed verdict should be denied. *Dixon v W W Grainger, Inc,* 168 Mich App 107, 110; 423 NW2d 580 (1987). If material issues of fact remain upon which reasonable minds might differ, they are for the jury. A plaintiff has the right to ask the jury to believe the case presented to it, however improbable it may seem. *Id.*

The elements of a prima facie case of intentional infliction of emotional distress are: (1) extreme or outrageous conduct, (2) which intentionally or recklessly, (3) causes, (4) extreme emotional distress. See *Roberts v Auto-Owners Ins Co,* 422 Mich 594; 374 NW2d 905 (1985); *Grochowalski v DAIIE,* 171 Mich App 771, 775; 430 NW2d 822 (1988). The defendant's conduct must be something more than a mere bad-faith breach of an insurance contract, *Kewin v Massachusetts Mutual Life Ins Co,* 409 Mich 401, 423; 295 NW2d 50 (1980). It must be more than mere threats, insults or indignities. *Roberts, supra,* p 603. It is also unquestioned that the extreme and outrageous character of the challenged conduct may arise from the abuse of a relationship which puts the defendant in a position of actual or apparent authority over the plaintiff or gives the defendant power to affect the plaintiff's interests. *Margita v Diamond Mortgage Corp,* 159 Mich App 181; 406 NW2d 268 (1987). See

also *Warren v June's Mobile Home Village & Sales, Inc,* 66 Mich App 386; 239 NW2d 380 (1976).

In denying defendant's directed verdict motion the trial court stated the following:

> *The Court:* Well, I guess honestly, counsel, I guess you have brought it right to a head. I think that's a question for the jury to decide, whether or not that contract is or that conduct is so outrageous, whether or not the meaning of a reasonable inspection includes going out without contacting the insured or having somebody representative of the insured present when things are taken out and shovelled out of the property and then later the representative of the company comes in and say, we could find no evidence of these things being there; and yet there's indications that things were shovelled out.
>
> I think that perfectly sets up the factual situation. I thank you both for pointing out to me the evidence as it came in. I had forgotten some of those things; but keeping them in mind, what both of you told me now, it would appear to me to be strongly a situation where on the facts and on the evidence, based upon appropriate instructions, the jury should have the opportunity to test this situation by the information where reasonable men may differ, it is for the jury, subject to the control of the Court to determine whether in the particular case the conduct has been sufficiently extreme and outrageous to result in liability.
>
> This would seem to me to be the appropriate language; and based upon the evidence that had been presented, I think it's appropriate for the jury to make that decision. Your motion is denied.

Viewing the testimony presented in a light most favorable to the nonmoving party, as we are required by law to do, we find no error in the trial court's denial of defendant's motion.

The conduct which plaintiff claims was extreme

or outrageous was the result of a combination of the following: Defendant was aware of the fact that plaintiff did not reside in the farmhouse which burned and defendant was aware of plaintiff's current address but defendant sent both the policy and proof of loss forms to plaintiff at the farmhouse address. Defendant's agent agreed to meet with plaintiff at a convenient time, but defendant's agent on two occasions trespassed on plaintiff's property without plaintiff's knowledge, consent, or presence to conduct an investigation. Defendant's cause and origin investigator trespassed on plaintiff's property. Defendant's agents, in the course of their investigation, altered, at least to some extent, the fire scene without plaintiff's knowledge or consent. Defendant's agent called plaintiff at or near midnight on August 16, 1983, and demanded that plaintiff give defendant a proof of loss statement over the telephone. Defendant procured a report, concluding that arson occurred, from its cause and origin investigator, despite the fact that defendant's agent noted in an internal document that the cause and origin investigator told defendant's agent that there was no evidence of arson. (Defendant vehemently objects to this fact as being nothing more than a mistake in notation by its own agent. However, defendant thoroughly cross-examined on this issue and it was fully presented to the jury.) Finally, defendant falsely accused plaintiff of the crimes of arson, false swearing and fraud.

After consideration of the above, we conclude that plaintiff made out a prima facie case relative to the element of extreme and outrageous conduct. Moreover, our thorough review of the trial transcript reveals that the evidence established that defendant, if not intentionally, recklessly caused plaintiff to suffer extreme emotional distress.

Plaintiff testified that the form of mental anguish that he suffered was the following:

> The rumor in the community that I was the—instead of like the reputation that I had earned of being like the honest guy that you can count on, next you know there's this cloud over my head that I'm the guy that torched his place over here on Wolfe Street, bought it just for that reason.

In addition, plaintiff testified that he was "shocked" at defendant's accusations that he committed arson, fraud and false swearing. Plaintiff also claimed to have suffered alone with the attendant emotional distress of the incident.

Our Supreme Court in *Roberts, supra,* in quoting with approval from the Restatement of Torts, stated that the liability for intentional infliction of emotional distress clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Moreover, there is no occasion for the law to intervene in every case where one's feelings are hurt. However, our review of the evidence in this case leads us to conclude that plaintiff has shown that defendant engaged in conduct amounting to more than the garden-variety type of noncompensable acts outlined in the Restatement. Defendant's conduct caused plaintiff to suffer more than hurt feelings. While it is true that plaintiff did not seek medical treatment because of the emotional distress he allegedly suffered, we do not believe that seeking and receiving medical treatment is a condition precedent to satisfying the element of extreme emotional distress. If nothing else, we are satisfied that reasonable minds might differ on this issue. *W W Grainger, Inc, supra.* It is not for this Court to weigh all of the competing evidence on this issue and reach some independent conclusion. *Fox, su-*

*pra.* Rather, we must determine if plaintiff put on enough proofs to make out a prima facie case. In our view, plaintiff did so. Therefore, we are unable to conclude that the lower court erred in denying defendant's motion for a directed verdict.

Defendant next contends that the trial court erred by permitting plaintiff to recover the replacement costs of his dwelling and contents when plaintiff failed to repair or replace his property. We disagree.

The homeowner's policy purchased by plaintiff contained the following provision:

> d. When the full cost of repair or replacement is more than $1,000 or more than 5% of the whole amount of insurance applicable to said building structure for the peril causing the loss, this Company shall not be liable for any loss under paragraph a. or sub-paragraph (2) of paragraph b. of this condition *unless and until actual repair or replacement is completed.* [Emphasis added.]

At trial, the evidence established that plaintiff did not repair or replace the destroyed dwelling. The jury awarded him $80,000 in replacement costs for the dwelling and $27,968 in replacement costs for the contents. The judgment awarded those amounts to plaintiff.

Defendant argues that the trial court erred by permitting plaintiff to recover replacement costs for his property. As support, defendant cites MCL 500.2826; MSA 24.12826, which states:

> Riders and endorsements may, in consideration of adequate premium or premium deposit, be added to the standard fire insurance policy, insuring property, whereby the insurer agrees to reimburse and indemnify the insured for the difference between the actual value of the insured property

at the time any loss or damages occurs, and the amount actually expended to repair, rebuild or replace with new materials of like size, kind and quality, but not to exceed the amount of liability covered by the riders or endorsements, such property as has been damaged or destroyed by fire or other perils insured against, *except that there shall be no liability by the insurer under the terms of said riders or endorsements to pay the amount specified in the riders or endorsements unless the property damaged is actually repaired, rebuilt or replaced at the same or another site.* [Emphasis added.]

Defendant argues that the language of this statute, along with the language of the insurance policy, established that plaintiff was required to repair or replace his property in order to qualify for recovery of replacement costs. Moreover, defendant concludes that because plaintiff did not meet the condition precedent, he should have been entitled to recover only the actual cash value of his property at the time of the fire. This amount, plus accrued interest, has been paid in a partial consent judgment.

Plaintiff, as support for his contention that he was not required to repair or replace his property in order to collect replacement costs, cites MCL 500.2827; MSA 24.12827. That statute provides as follows:

(1) In consideration for adequate premium or premium deposit, riders or endorsements may be added to the standard fire policy, insuring property, by which the insurer agrees to reimburse and indemnify the insured for the difference between the actual cash value of the lost or damaged insured property at the time of the loss or damage, and the amount actually necessary to repair, rebuild, or replace the lost or damaged insured property to a condition and appearance similar to

that which existed at the time of the loss or damage based on the use of conventional materials and construction methods which are currently available without extraordinary expense. The insurer's liability shall not exceed the amount of liability covered by the contract of insurance.

(2) The contract of insurance established pursuant to subsection (1) shall not preclude an insured from selecting a cash settlement based on the actual cash value of the lost or damaged insured property at the time of the loss or damage, but not to exceed the amount of liability covered by the contract.

(3) The contract of insurance established pursuant to subsection (1) may provide that there shall be no liability on the part of the insurer to pay an amount in excess of the actual cash value of the lost or damaged insured property at the time of the loss or damage, unless the lost or damaged property is actually repaired, rebuilt, or replaced at the same or another contiguous site. *However, this subsection shall not apply if the amount of loss or damage to the insured property under the standards of subsection (1) exceeds the amount of liability covered by the contracts.* [Emphasis added.]

Plaintiff contends that the evidence produced at trial established that replacement cost of the dwelling was $80,000. However, plaintiff argues that debris removal would be necessary before replacement or repair could begin. The cost of that removal would be charged to the coverage, thereby reducing the coverage available for replacement or repair. Therefore, the cost to replace or repair the property would then exceed the coverage available. As a result, pursuant to MCL 500.2827(3); MSA 24.12827(3), plaintiff would no longer be required to repair or replace the property in order to collect replacement costs. We need not decide this issue since we are limiting recovery for other reasons

stated below. Plaintiff also argues he was excused from repairing or replacing his property due to impossibility of performance, repudiation of the contract and equitable considerations.

We note that this Court in *Pollock v Fire Ins Exchange,* 167 Mich App 415; 423 NW2d 234 (1988), stated that if an insurer hinders an insured's performance of a condition precedent, that performance is excused on equitable grounds. We are persuaded that, under the facts of this case, plaintiff was excused from performing the condition precedent. Without the necessary funds being advanced by defendant, plaintiff would have little likelihood of being able to secure financing to repair or replace his property. See also *Zaitchick v American Motorists Ins Co,* 554 F Supp 209 (SD NY, 1982). Therefore, we conclude that plaintiff established that he was entitled to recovery for replacement costs without actually replacing his property.

Defendant next contends that the trial court erred by permitting plaintiff to recover an award in excess of the policy limits in his insurance contract. We agree.

The replacement cost provision in the insurance policy covering plaintiff's property, in pertinent part, provided the following:

> a. If at the time of loss the whole amount of insurance applicable to said building structure for the peril causing the loss is 80% or more of the full replacement cost of such building structure, the coverage of this policy applicable to such building structure is extended to include the full cost of repair or replacement (without deduction for depreciation).
>
> *     *     *
>
> c. This Company's liability for loss under this

policy shall not exceed the smallest of the following amounts (1), (2), or (3):

(1) the limit of liability of this policy applicable to the damaged or destroyed building structure;

(2) the replacement cost of the building structure or any part thereof identical with such building structure on the same premises and intended for the same occupancy and use; or

(3) the amount actually and necessarily expended in repairing or replacing said building structure or any part thereof intended for the same occupancy and use.

Plaintiff basically contends that the jury determined the replacement cost of plaintiff's dwelling to be $80,000, and that the jury determination may not be set aside unless it is clearly erroneous. MCR 2.613(C). We believe that the above quoted language is sufficiently clear in that defendant contracted with plaintiff to limit its liability to the amount referenced in subsection (1), or $64,000. See *Snapp v State Farm Fire & Casualty Co,* 206 Cal App 2d 827; 24 Cal Rptr 44 (1962). Therefore, we reverse that portion of the lower court judgment awarding plaintiff $80,000 for the replacement cost of the dwelling and remand to the circuit court for entry of an amended judgment.

Finally, defendant contends that the trial court erred in ordering that plaintiff was to recover both statutory interest, as allowed under MCL 600.6013; MSA 27A.6013, and penalty interest, pursuant to MCL 500.2006; MSA 24.12006. We agree.

In its judgment on the jury verdict the trial court awarded plaintiff both statutory judgment interest and penalty interest. The complaint in this case was filed in 1984. Interest on a money judgment recovered in a civil action is statutorily created. MCL 600.6013; MSA 27A.6013. This statute provides in pertinent part:

(1) Interest shall be allowed on a money judgment recovered in a civil action, as provided in this section . . . .

\* \* \*

(4) For complaints filed on or after June 1, 1980, but before January 1, 1987, interest shall be calculated from the date of filing the complaint to the date of satisfaction of the judgment at the rate of 12% per year compounded annually . . . .

The purpose of an award under this section is to compensate the prevailing party for delay in receiving money damages. *Stewart v Isbell,* 155 Mich App 65, 79-80; 399 NW2d 440 (1986); *McDaniel v Macomb Co Bd of Road Comm'rs,* 169 Mich App 474, 477; 426 NW2d 747 (1988).[1] This section providing for payment of interest on all money judgments entered in civil actions is mandatory and not permissive. *Isbell, supra,* p 80; *Marina Bay Condominiums, Inc v Schlegel,* 167 Mich App 602, 609; 423 NW2d 284 (1988).

The Legislature has also provided in the Uniform Trade Practices Act, MCL 500.2001 *et seq.*; MSA 24.12001 *et seq.,* that an insurer is liable for penalty interest if it fails to timely pay a claim not

---

[1] We note that this Court in *Waldrop v Rodery,* 34 Mich App 1, 4; 190 NW2d 691 (1971), .which is the genesis for the above case authority interpreting the purpose of statutory interest, properly stated that interest and court costs are added to a judgment to recompense the prevailing party for the delay in payment of the money damages determined and to put back in his pocket some of the expense he incurs in instituting and prosecuting an action. However, this statement of the law has inappropriately been changed to state that the purpose of statutory interest is to compensate the prevailing party for expenses in bringing the action and for the delay in receiving money damages. Obviously, we believe that the appropriate statement of the law is that court costs are to compensate the prevailing party for expenses in bringing the action. See and compare *Isbell, supra,* and *Macomb Co Bd of Road Comm'rs, supra,* with *Schwartz v Piper Aircraft Corp,* 90 Mich App 324, 326; 282 NW2d 306 (1979); *Wood v DAIIE,* 99 Mich App 701, 709; 299 NW2d 370 (1980), rev'd in part on other grounds 413 Mich 573; 321 NW2d 653 (1982); *In re Cole Estate,* 120 Mich App 539, 550; 328 NW2d 76 (1982).

reasonably in dispute. MCL 500.2006(1) and (4); MSA 24.12006(1) and (4) provides the following:

(1) A person must pay on a timely basis to its insured, an individual or entity directly entitled to benefits under its insured's contract of insurance, or a third party tort claimant the benefits provided under the terms of its policy, or, in the alternative, the person must pay to its insured, an individual or entity directly entitled to benefits under its insured's contract of insurance, or a third party tort claimant 12% interest, as provided in subsection (4), on claims not paid on a timely basis. *Failure to pay claims on a timely basis or to pay interest on claims as provided in subsection (4) is an unfair trade practice unless the claim is reasonably in dispute.*

\* \* \*

(4) When benefits are not paid on a timely basis the benefits paid shall bear simple interest from a date 60 days after satisfactory proof of loss was received by the insurer at the rate of 12% per annum, if the claimant is the insured or an individual or entity directly entitled to benefits under the insured's contract of insurance. Where the claimant is a third party tort claimant, then the benefits paid shall bear interest from a date 60 days after satisfactory proof of loss was received by the insurer at the rate of 12% per annum if the liability of the insurer for the claim is not reasonably in dispute and the insurer has refused payment in bad faith, such bad faith having been determined by a court of law. The interest shall be paid in addition to and at the time of payment of the loss. If the loss exceeds the limits of insurance coverage available, interest shall be payable based upon the limits of insurance coverage rather than the amount of the loss. If payment is offered by the insurer but is rejected by the claimant, and the claimant does not subsequently recover an amount in excess of the amount offered, interest shall not be due. *Interest paid pursuant to this*

*section shall be offset by any award of interest that is payable by the insurer pursuant to the award.* [Emphasis added.]

The statute is intended to provide a penalty to be assessed against recalcitrant insurers who procrastinate or are dilatory in paying meritorious claims in bad faith. *Commercial Union Ins Co v Liberty Mutual Ins Co,* 426 Mich 127, 136, n 5; 393 NW2d 161 (1986); *Medley v Canady,* 126 Mich App 739, 743; 337 NW2d 909 (1983). This statute evinces no intent to compensate a plaintiff for the delay in recovering funds rightfully his. *Canady, supra,* pp 743-744. As a penalty, the statute is to be strictly construed. *Canady, supra,* p 744.

It is obvious to us that the statutory interest statute and penalty interest statute address two distinct concerns. The statutory interest statute is directed at ensuring that a prevailing party is compensated for the delay in receiving money damages. On the other hand, the penalty statute seems to be directed at ensuring that an insurer that either procrastinates or is dilatory in paying meritorious claims is punished. Consequently, it would seem obvious that a prevailing party should be entitled to recover both types of interest. Such a conclusion is consistent with what is allowed, for example, under Michigan's automobile no-fault law. In a no-fault matter, a prevailing party is allowed to recover both statutory and penalty interest when an insurer unreasonably refuses to promptly pay personal protection benefits. See MCL 500.3142; MSA 24.13142, and *Wood v DAIIE,* 413 Mich 573, 589-590; 321 NW2d 653 (1982); *Johnston v DAIIE,* 124 Mich App 212, 214-215; 333 NW2d 517 (1983), lv den 417 Mich 1100.26 (1983).

Nonetheless, the Legislature has specifically provided in the penalty interest statute in the Uni-

form Trade Practices Act, unlike in the automobile no-fault act, that an award of penalty interest *shall* be offset by any other award of interest that is payable by an insurer pursuant to the award. Based on this plain language, we are constrained to conclude that an award of penalty interest pursuant to the Uniform Trade Practices Act must be offset by any award of interest that is payable by the insurer pursuant to the award. Therefore, in this case, the lower court erred in awarding plaintiff both statutory and penalty interest. Plaintiff's award of penalty interest should stand. However, that award should be offset by the statutory interest award.

Affirmed in part, reversed in part and remanded to the trial court for entry of a revised judgment on the jury verdict in a manner consistent with this opinion.